Thank you very much. We're going to go on to case number 3, 23-2301, Reginald Pittman v. Madison County, Illinois, and it's Mr. Anderson. Good morning, Mr. Anderson. Good morning, Your Honor. I didn't mean to interrupt. No, you didn't. Go ahead. I am Ross Anderson here for the Court. At 9.30 p.m. on December 19, 2007, Plaintiff Reginald Pittman, a pretrial detainee in the Madison County Jail, used a blanket to hang himself from the bars of his cell. Plaintiff was in a two-cell segregation unit because it had bedclothes and clothing from which a noose could be made, because it had a crossbar, and because it had a fixed stool from which Plaintiff could stand, it provided the perfect instruments from which Plaintiff could hang himself, and it was not an appropriate cell for protecting Plaintiff from self-harm. There were available suicide prevention cells at the time of Plaintiff's suicide attempt. Compounding the danger presented by his cell, he was in a two-cell segregation unit that was separated from the rest of the jail by a door and a small window, and his cell was off to the side so it could not be viewed when making rounds through that door. Plaintiff's suicide attempt resulted in asphyxia and severe brain damage. The primary evidence in this case concerning the suicide attempt and the events leading up to it and the conduct of the defendants came from the other detainee in that two-cell segregation unit, a witness named Bradley Banabese. In a recorded interview that took place approximately two hours after the event, Bradley Banabese stated that five days before the event, on Friday, December 14, the Plaintiff asked defendant jail deputy Matthew Warner to arrange for a crisis referral. It was a Friday evening. Crisis was not on the premises. Defendant deputy Warner, according to Banabese, did not take Plaintiff seriously. Warner promised Plaintiff that he would put his name on the crisis list on Monday, the following Monday. Mr. Anderson? Yes. As I we're familiar with the tragic facts of this case in general, we know it's been tried three times. Correct. As I understand it, the only issue on appeal is one of the jury instructions. That's correct. So could we focus on that, and could you tell me what you believe the material differences are between the key instruction given at the third trial and the portions that were approved in our last decision in this appeal and the instruction given in this trial? Yes, sir. And those key differences focus on basically the instruction given in this trial focuses on the law in this case. Miranda? Sorry, could you could you point me to the language you're focusing on? I am focusing primarily on paragraph two of the instructions. And yeah, yeah, you see the challenge language in sections one and two of the jury instruction seems certainly to be nearly identical to the language that was approved in that instruction in Pittman three against a challenge based on Miranda and Kingsley. Why then doesn't the law of the case doctrine apply such that we shouldn't consider the challenge? Because they are not in critical point identical, Judge. In these paragraph two, I think absolutely makes this a reintroduction of the subjective intent that the court disapproved in Pittman. In paragraph two, it requires that there be a finding that defendant Eaton and Warner were aware of a strong likelihood that the plaintiff would seriously harm himself or strongly suspected facts showing that strong likelihood. In the first instance, and I... That, okay, here's here's our problem. That language was used in the trial that led to Pittman three. Correct. You challenged it then. We approved that in paragraph three. Correct? Correct as to the first prong only. And if the court will look at Kingsley, what Kingsley had to say... Okay. What I'm trying to... You seem to be wanting to say Pittman three was wrong. No. Because if you... Or contradicted itself. If you look at the exact language, it said that the jury may on the first prong, and I'm looking at page 827 through 828, were aware of or strongly suspected facts and that the language that they were approved goes to the first inquiry, whether the defendants act personally, knowingly, or perhaps even recklessly, and whether their actions would lead to harmful results. That is not what... That is what is in my instruction. That is not what is in the court's instruction. What is in the court's instruction is that they must be aware of the strong likelihood that the standard that at the time that they took the actions to deny... It's hard to see a material difference, though. Yes. I think it's an absolutely... And I think it makes all the difference, Judge, because it's now Eighth Amendment. They have to know that he's going to kill himself, or that they have to know that there is going to be a suicide attempt when they deny or strongly suspect facts that support it. Every piece of evidence in this case is that this conduct was miserable. You cannot delay till Monday. You cannot not put him in a modesty suit if you do delay. You cannot not protect his surroundings. You cannot fail to take an action if you believe there's going to be suicide. His superintendent said if he did these things, he should be fired. Were the arguments that were raised in this appeal equally available in Pitman 3? I mean, why should we consider a challenge to the jury instruction if it could have been raised in the last challenge to the same instruction? Because in this case, and while I did, you're correct, Your Honor, I cited the Ninth Circuit pattern jury instruction, but the issue here... In fact, the issue in all of these pertinent cases has to do with the extended period of time that the individual is undergoing problems before they try to kill himself. In Miranda, it was a starvation issue. In Gordon, it was long-term consequences of drug use. In our case, it's a five-day period of time where he has been denied treatment, where he has been denied referral to crisis, where he has not been put in a protective custody, and where he has again been denied and he's been given bad news. Over that time period of time is the period of time where almost certainly he decided to commit suicide. He was seeking help. He wanted to have crisis. To say that he knew at the time, or they were aware of the strong likelihood that he's going to commit suicide is simply not supported by the facts. They quoted, in his argument, John did a very nice job of quoting my expert, and saying my expert says determining whether there's actual suicide risk and there's going to be suicides is like predicting the weather, but these actions are terrible, and each one of them increases and creates a substantial risk of harm. And I pointed out to the court in the first trial, because the first trial was trialed under a federal failure to provide medical needs, that was exactly what was given to the jury, and the jury wrangled with this case, and they wanted the evidence in the videotape, which was kept out at that time, and they almost hung up. They actually advised the court that they were hung up at one point. And so a very different situation to have to prove, and I don't think you can prove that in any suicide case, that they knew that there was a strong likelihood that he's going to commit suicide, particularly where he is requesting assistance or counseling. And that's effective stuff under all the evidence in the case. So I think it's substantially different. I don't believe that it's the same issue that was presented, because frankly, I walked into this trial believing that the language, the very language, and I've raised tech about it in trial too, that the very language and pitman and under the series of cases was that the first prong was limited to the act of the defendant that substantially increased the risk. I hear you, but I haven't yet heard an answer to my question. All right, please. I did not mean to not answer. I'm looking at the same paragraph in the 2020 Pitman opinion by then Circuit Judge Barrett, end of page 827, start of 828. First part of that paragraph, Pitman's argument fails as to the instruction that the jury decide whether the defendant's quote were aware of or strongly suspected facts showing a strong likelihood that Pitman would the correct legal standard to the jury. That looks like the key language in paragraph two as given in this trial that you're telling us was wrong. What is wrong about this? The last part of that sentence also goes on to say the standard to the jury if the defendants were aware that their actions would be harmful. And in this case, that is not there. What it says is that the defendants were aware of the strong likelihood that the defendant would seriously harm himself. And the distinction is set out, I think, very nicely by contrasting the Ninth Circuit opinion that, or Ninth Circuit proposing, or actually instruction now, that they made an intentional decision with respect to the conditions under which the defendant was confined, that's what they did, and they put him at substantial risk. The substantial risk standard was also used in the first trial and that made all the difference in the response to the jury. He didn't decide to kill himself. Okay, I'm going to try one more time. All right. Point me to the material difference between the instruction approved, the portions of the given here. I only am relying on the language and the opinion which limits that operation to their actions. What happens here in paragraph two states that they were aware of the strong likelihood that he would seriously harm himself, period. And it doesn't limit it to what Kingsley says or what Miranda says, which has to do with the first prong is limited to the acts of the defendant. If you want to argue that Pittman III was wrong, I would understand your argument. All right. I don't understand an argument that says it's right and that the district court failed to follow it here. Well, Your Honor, I appreciate that and if indeed it's not limited to the very acts that we're talking about and it's not limited to the idea that you are substantially increasing risk, because that's what was done here. Each one of these actions substantially increased the risk to the plaintiff. Failure to refer, did it twice, didn't provide medical care, according to the expert testimony, lowered his self-esteem and created a separate suicide risk. The other actions, failure to protect, all of those things put him in the wrong environment. All of those things, each substantially increased risk. Mr. Anderson, can I, can I... So if, and it made the difference because that was also substantial risk was in the first trial. Mr. Anderson, can I ask you a question here? Sure, please. Okay. Taking Judge Hamilton up on his offer, okay, courts make mistakes. Did we make a mistake in Pittman III? Honestly, in my heart of hearts, I think so, yes. Okay. Then that's a different point. All right. You're right. Okay. That's a different point. Okay. And why or where? Because objectively, it is now an objective standard. And what has to be done, if you are actually operating in an objective standard, and you say that the defendants must know that there is a substantial likelihood of self-harm, which is essentially a suicide attempt, at the time that you were intervening, what you have done is you have introduced a subjective element into what is necessary to find liability. Okay. Now, I think the reason that the courts around the country are having a heck of a time with this, okay, we're not the only one. We got a bunch, I mean, you're focused on the Ninth Circuit. I get it. But we have other cases. We have Kemp. We have Thomas. We have two other appeals that are dealing with this issue. Okay. Courts around the country are struggling with it. Why? In my view, because of confusion about how to apply Kingsley Step 1. You know what I mean? I absolutely. Okay. And so, in your view, if you had a blank piece of paper, and you could say, forget all this precedent, what does a plaintiff need to prove under Kingsley Step 1, if it's properly stated in your view? In my view, they must prove, and it could be just exactly as Judge Coney Barrett said, it could be any of a number of standards, but they must prove that there is an intentional decision that was made with respect to the elements of confinement or the failure to deny treatment that substantially, objectively increased the risk of suicide to the plaintiff. Right. And so, would you agree that that means essentially non-accidental conduct? Non-accidental is... All I'm doing is trying to... So, in Kingsley, the court gave the example... Kingsley is an excessive force case. Correct. Okay. So, Kingsley gave the example of two instances where there would not be knowing or intentional conduct. One, a taser accidentally goes off and tases somebody, but the officer did not pull the trigger or whatever you do to get a taser to go off. Okay. And number two, an officer stumbles while walking, trips and falls on somebody and hurts them. Okay. Those are the two examples that are given in Kingsley. So, this is a different case, this is an excessive force. Right. So, take Kingsley and translate it here, setting aside our precedent, what does it require? It requires that somebody, and in this case, there has to be objective evidence, somebody violates those rules and standards of objective evidence or standards of conduct and does so in a reckless or deliberately intent way, and that their act does this, and they know or should know that it increases the risk of suicide substantially. You don't have to know that he's going to commit suicide. And that is my entire point. Here, this instruction says that you must, and I'll turn to it, that you must be aware of the strong likelihood that plaintiff would seriously harm himself or strongly suspect facts showing a strong likelihood. The evidence in this case is that over time, he kept requesting to see crisis and wondering why the crisis lady wasn't here. This went on for days. On Tuesday, four days later, he asked Defendant Sergeant Randy Eaton, where's the crisis lady? Why haven't I seen the crisis lady? And Eaton, again, promised him that he's going to put the guy in for crisis. These are intentional acts or reckless acts, because if you don't give a person in solitary, protect them, give them access to counseling, put them in a protective environment, and leave them there with all of this stuff that can be used as a hanging device, which everybody in the case, I don't know if it's jumping off the page, but everybody in the case says that's not even close. You don't do that with somebody who is requesting crisis and then give bad news. And the evidence is clear that by Wednesday, he's had enough. So he writes a suicide note at that point. And in that note, he says the guards are effing with him. In that note, he says that, you know, he apologizes for what he does. And if the court will give me a second, I want to turn to the exact language of the note. I hope I can turn to the exact language of the note. I may have to rely on my memory here. He says, specifically, I tried to see the crisis lady, but they ain't let me. I told them, period. No one listened to me. Now, this is something that he has done over time, and by, it's very clear, and I think virtually the only interpretation under this evidence, is that they denied this on Friday. He kept asking about it. They didn't, promised him again, and by the way, promising that you're going to do this also carries and creates an independent suicide risk. And they, by all of the expert testimony, and they did that, and then he writes, I tried to see the crisis list, but they ain't let me. I told them, no one listened to me. And from a causation perspective, Dr. Khan, who, as part of his career, does something that he is a quality insurance autopsy of facts to determine causation and whether failure to adhere to policy and procedure actually causes things, and he has said that he has never seen such a clear case of causation in the thousands of cases he has done this medical autopsy on, and I see I've just used up my time, so I. Yeah, well. That was a while ago. That was quite a while ago, but that's okay. I apologize, Your Honor. My ex-wife's criticisms of me, Your Honor, are probably correct. No, no, no. Did you say your ex-wife? I said my ex-wife said I talked too much. You have a new one? At any rate, I thank the court for listening. Thank you. Hello, Mr. Gilbert. Good morning, Judge, and good morning, Your Honors. May it please the surprise that my argument is that this court's decision in August of 2020 gave us a road map for retrial, and I am happy to say that we followed that road map in the third trial of this case. Judge, do you agree? Now, yeah. Let me ask you this. Because the law of the case doctrine is not jurisdictional, it doesn't deprive us of the power to consider the issue that was raised here. In your view, has there been any intervening change in the law or other extraordinary circumstance that would weigh in favor of our reconsidering the jury instruction challenge? Your Honor, I do not believe so, and none was cited by Mr. Anderson in his brief or his argument. As this court stated, in Pitman 3, the final sentence of the opinion deals with the law of the case doctrine in which the court says a ruling made in an earlier phase of litigation controls the later phases unless a good reason is shown to depart from it. And I'm certainly not aware, and it hasn't been brought to the court's attention, that either this court or the U.S. Supreme Court has changed the legal standards that were enunciated and adopted by this court in Miranda. And in Pitman 3, as this court has already recognized in its questioning of Mr. Anderson, the court says the exact wording that is now being challenged has failed. And the court indicated to us that the two prongs of Miranda are taken into consideration. The first prong, as the court said, was satisfied by that language about defendants were aware of or strongly suspected, facts showing a strong likelihood that Pitman would harm himself. And I think where, with all due respect, I think where Mr. Anderson might be conflating a subjective element with just the requirement in Miranda that the jail officers had to know something. You know, you can't, it's a two-part test. You don't get to the objective reasonable part until you're able to show that they at least had knowledge of something, of objective facts, that somehow showed that their actions, as the court said in Pitman 3, would lead to harmful results. It's not a subjective element. I don't think that the instruction or this court's opinion in Pitman 3 said that at all. It approved, as the court has already recognized, the exact language that we used in instruction number 19. And Judge Dugan, in our view, was right to do that because, as I said, I always took Pitman 3 as a roadmap for the retrial of the case. It was retried on the same evidence. Every other jury instruction was the same. We removed the one word that this court advised us was wrong in that instruction in the second trial. And in our view, the third trial was essentially flawless because the same evidence went before the jury. The jury instruction was approved by this court in Pitman 3, and the jury ruled in our favor once again. And I think that the emphasis that Mr. Anderson was putting on the facts is sort of a distraction because the facts, that was the jury's realm. We're here only on this jury instruction. And in fact, Judge Scudder's question, I thought, was pretty incisive about, and Judge Hamilton, too, mentioned this, that are you saying we were wrong in Pitman 3? Well, of course, I don't think so. But there's also a procedural issue there. That wasn't raised by the plaintiff, either in his briefing or in the court below. And so our position would be that that's forfeited because never was there an argument that this court had decided Pitman 3. So I think... Mr. Gilbert, your argument's clear. I mean, it's clear in your brief. You're articulating it clearly in the courtroom. Can you just step back for a minute, a second? Sure. And you know Kingsley. You've read Kingsley as many times as we have, as many times as Mr. Anderson has. What do you make of Kingsley Step 1 in a case like this outside of the excessive force context? So you have a medical care case, right? That's what this is. Right. Okay. How do you apply it? I think this is what courts are struggling with around the country. Well, I think this court... Because you can't have liability for non-knowing, non-conscious, you know, non-intentional conduct. I mean, you can't impose 1983 liability. And that's how I interpret it. So I think that explains the existence of Kingsley Prawn 1. Right. And then the question is how does it apply outside of the excessive force context? Well, I think the way it applies outside of the excessive force context is that the defendants, as in this case, have to know or at least have reason to know of facts that would indicate or suggest that the plaintiff was at risk of harm. And that's how I see that applying. And again, I don't think it's a subjective element. It's that you can't... It's almost like saying, well, I can't be liable. You gave a pretty good hypothetical when Mr. Anderson was arguing. If I'm a police officer, well, that's excessive force. But if I'm a jail officer and I have... It's interesting. I'll give you an example. I'll give you one that works. Okay. Here we're focused on two correctional officers, right, in particular. Suppose we're focused on a third, and let's call him John Doe. Okay. And he was working in an entirely different area of the jail. Right. He doesn't have any idea who Mr. Pittman is, anything like that. Right. So, if you go through the Kingsley analysis there and you say John Doe too is responsible for the failure to provide medical care, Mr. Doe is going to come in and say, I can't possibly be liable. I had no knowledge, and I did nothing to create the conditions, right, that presented a risk to Mr. Pittman because I was working on the fifth floor and all this happened on the first floor, or whatever. Now that, I mean, that's a straw man because it's a little too easy. But I think you're right. That's an example. But I think you're right, Judge, because you can't hold someone liable under the Fourth Amendment standard from Kingsley unless they at least have knowledge of the facts that then enables you to go to the next step of the analysis of did they take objectively reasonable measures or not because if they're not aware. You know about our decision in a case called Kemp versus Fulton County. Does that ring any bell? I'm sure I've read it, but it doesn't come to mind at this point. All right. I mean, Kemp is a failure to protect context. It's different than this, but not too different. And we rejected the contention there that a plaintiff must prove that the defendant was subjectively aware of a substantial risk of serious injury. Mm-hmm. And I don't disagree with that. I think the difference is that to me, and I think this is what the current state of law might be suggesting, is that you don't have to have subjective awareness of a risk, but at a minimum you have to have knowledge of facts that then require the next step to the objective reasonableness analysis. Okay. Can you pause right there? Just pause right there, okay? Because this is where I think the issue is joined. Mm-hmm. Okay? Because if what you said is correct, now go to the instruction that was given. Mm-hmm. Step two. Yes. Eaton and Werner were aware of this strong likelihood that plaintiff Pittman would seriously harm himself or stop, because it's or. Yeah. Okay. Now, take what you just said and square it with that. Okay. The way I would square it, Your Honor, is that it's like any other issue in the law. You can't have liability unless a defendant has knowledge of the potential for harm, if you will. So, for example, in Pittman 3, the court says, if the defendants were aware that their actions would be harmful, then they acted purposefully or knowingly. If they were not necessarily aware, but nonetheless strongly suspected, then they acted recklessly. This much is inconsistent with Miranda. And what I think, and maybe I'm not articulating as well as I could, but I think that in order to have liability, there has to be at least a minimum knowledge that what you're doing or not doing places someone in harm's way. Because if, so, for example, Mr. Anderson. I think you're doing a fine job. This is where, I mean, the federal judiciary is tongue-tied on this. I know, and certainly we could argue this all day long, and different courts differ, but a good example, I think, is when Mr. Anderson talked about the suicide note. There's no, well, actually the evidence in the case is the guards were not aware of the suicide. Well, that came later in the timeline, right? Yeah, it came, well, according to the testimony, he wrote the note time of days before he committed suicide, or attempted suicide. In fact, his cellmate, if you will, Mr. Banavese, I think we were able to show was aware of the contents in the note, and he didn't do anything. But, again, if they don't know about the request, of course, that was a fact question, which I think the jury resolved as to whether or not he actually asked the officers who were sued for crisis intervention. That was never proved. That was an allegation. And in the suicide note itself, he says, they won't let me never identify as who. But getting back to the conundrum that we have in the state of the case law, I would still argue that to satisfy Kingsley, there still has to be some modicum of knowledge, whether it's new or should have known or suspect, before you can set someone up for liability and move to determine whether or not, based on what they knew, they acted objectively reasonably. And I don't envy the court having to struggle with that, because it really is tricky. I was looking at the new pattern instructions for these cases. They differ quite a bit from the pattern instruction we modified for this case, and I think it reflects that struggle that the Supreme Court will give us a little better direction. But it's really tough, because in the pretrial detainee situation, we've been struggling with what the Fourth Amendment requires for a long, long time. And like you, I'm not satisfied with it either, because I try a lot of these cases. And when you have jury instructions that, you know, are still in the middle of this debate, it makes it tough. And so I appreciate the court's time. I appreciate the opportunity to present our argument. Thank you very much. Thank you very much, Mr. Gilbert.  Mr. Anderson. I just want to respond. Can you wait? You have to wait. I apologize. You have to talk into the mic. Yes, ma'am. Okay. The first thing is objective standards. They were trained not to do it. Everybody has said you cannot wait. You have to refer. If you promise, it's the worst thing you can do if you don't follow through. That meets an objective standard. The second point is the court's, and John just mentioned them, the court's Eighth Amendment and Fourteenth Amendment failure to provide medical care set out in paragraph two this exact issue and show what the court's proposed instructions mean. In paragraph two of the Eighth Amendment, they say exactly what was said in this case. Defendant actually knew or was actually aware of facts from which it would be obvious that the plaintiff had a serious medical need and they failed to refer. The language in the Fourteenth Amendment 7.17b is that the defendant knew or should have known the plaintiff had a serious medical need or strongly suspected facts. The first prong of that is clearly objective. The court has thought enough of it to include the difference between the Fourteenth Amendment and the Eighth Amendment in its new proposed to failure to provide medical care elements. And I think it perfectly illustrates what we're talking about here. The objective need, of course, is knew or should have known. And then, of course, it goes on to say failed to take, in both cases, failed to take reasonable steps to alleviate the risk. That's all I wanted to say. Thank you. All right. Well, thank you to both Mr. Anderson and Mr. Gilbert. And the case will be taken under advisement. And we will go on to the next case.